# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN H. SUNUNU and VICTOR H. FRANK, Jr., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 98-cv-1192 (RCL) |
| PHILIPPINE AIRLINES, INC., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case arises out of a contract dispute between the national airline of the Philippines and a former White House Chief of Staff.  Facing turbulence during the Asian Financial Crisis of the 1990s, Philippine Airlines ("PAL") sought to renegotiate its aircraft lease agreement with World Airways ("WA").  To facilitate discussions, PAL retained John H. Sununu, the former Governor of New Hampshire and Chief of Staff to President George H.W. Bush, and his partner, Victor H. Frank, Jr., a former U.S. Director of the Asian Development Bank.

In a brief business arrangement characterized by vague promises and poor communication, PAL and the Sununu-Frank tandem found themselves facing a half-million dollar disagreement about payment for services.  Sununu and Frank filed suit in May 1998, alleging breach of contract, unjust enrichment, and fraud.  The litigation went into a nine-year holding pattern while PAL endured financial reorganization proceedings in the Philippines. After re-emerging from bankruptcy, PAL moved to dismiss the complaint.  This Court granted PAL's motion on the breach of contract claim but allowed discovery to proceed on unjust enrichment and fraud.  PAL now moves for summary judgment on those two counts.

## II. BACKGROUND

### A. Factual History

This case revolves around two contracts. The first is the Aircraft Services Agreement ("ASA") concluded by PAL and WA on April 30, 1996. Def.'s Mot. Summ. J. Ex. 1, ECF No. 49-4 ["ASA"]. This contract includes, among other provisions, PAL's agreement to lease two aircraft from WA for an eighteen-month term between June 15, 1996 and November 15, 1997. *Id.* ¶ 2.1. PAL agreed to pay $6,000 per hour for one aircraft and $4,650 per hour for the other, subject to minimum usage requirements. *Id.* ¶ 4.1. The two airlines agreed that the ASA "constitutes the entire contract" between them and "shall not be varied, contradicted, explained or supplemented by any oral agreement or representation." *Id.* ¶ 27.2.

PAL and WA amended the agreement formally several times. The change most relevant to these proceedings was WA's agreement to make two more aircraft available to PAL for lease "during the third and fourth quarter of 1996." Def.'s Mot. Summ. J. Ex. 3, ECF No. 49-6, ¶ 1.4. Neither this amendment nor any other written supplement altered the lease termination date for the first two aircraft or specified a termination date for the two additional aircraft. *Id.*; *see also* Def.'s Mot. Summ. J. Exs. 2 & 4, ECF Nos. 49-5 & 49-7.

PAL exercised its option to lease the two additional aircraft and took delivery of two MD-11 jetliners on September 19, 1996, and September 26, 1996, respectively. Def.'s Mot. Summ. J. Ex. 6, ECF No. 49-9, at 2, 5. The termination date of these leases became a source of disagreement between PAL and WA. WA believed that the leases should extend eighteen months from the *date of delivery*. Def.'s Mot. Summ. J. Ex. 7, ECF No. 49-10, at 2; Pl.'s Opp'n. I, ECF No. 57-11, at 2. In August 1996, WA executive Ahmad Khatib wrote PAL Chief Financial Officer Jaime Bautista a letter suggesting that the two airlines had reached a verbal

understanding to this effect. *Id.* Replying in January 1997, Bautista denied the existence of any such oral agreement and insisted that all four leases should terminate on November 15, 1997. Def.'s Mot. Summ. J. Ex. 5, ECF No. 49-8; Pl.'s Opp'n Ex. J, ECF No. 57-12, at 2 ["Bautista Letter"].

The dispute escalated from there. Khatib responded that he was "personally dismayed" by PAL's contention and that "PAL's logic seems more reflective of PAL's current financial state than with the agreement and established practice of our two companies over the past 5 months." Def.'s Mot. Summ. J. Ex. 8, ECF No. 49-11, at 3, 4; Pl.'s Opp'n Ex. K, ECF No. 57-12, at 3, 4. He cited numerous prior oral amendments to the ASA and reiterated WA's view that the lease terminations should be based on the aircraft delivery dates.[1] *Id.* at 3–5. WA reported its dispute with PAL over the lease termination dates in public Securities and Exchange Commission ("SEC") filings on March 31, 1997 and May 14, 1997. Def.'s Mot. Summ. J. Ex. 9, ECF No. 49-12, at 8 ["WA's 10-K"]; Notice of Errata in Def.'s Stmnt. of Mat. Facts, Ex. A, ECF No. 52, at 19 ["WA's 10-Q"]. The dispute coincided with PAL's worsening financial condition. On March 11, 1997, PAL explained to WA that it had suffered "huge losses," expressed its desire to restructure its financial relationship with WA, and implored WA not to declare it in default. Pl.'s Opp'n Ex. M, ECF No. 57-15, at 2.

PAL's desire to renegotiate the lease agreement gave rise to the second key contract in this case—the agreement between PAL and Sununu-Frank. PAL approached Sununu and Frank about facilitating negotiations with WA in the spring of 1997, and the two men met with PAL Chairman Lucio Tan in late May or early June. Decl. of John H. Sununu, ECF No. 57-1, ¶¶ 3, 4 ["Sununu Decl."]. Tan explained that Philippine President Joseph Estrada had asked him to

---

[1] The WA letter reports that the airlines had agreed to shorten the lease terms from eighteen months to seventeen months, apparently to accommodate PAL's labor agreement with its flight deck crew. Def.'s Mot. Summ. J. Ex. 8, ECF No. 49-11, at 3; Pl.'s Opp'n Ex. K, ECF 57-12, at 3. This change is not disputed.

invest more money in PAL and that renegotiating the ASA was an urgent priority.  *Id.* ¶ 4.  He also told Sununu and Frank that the leases would terminate on November 15, 1997.  *Id.* ¶ 5.

Sununu and Frank sent a contract proposal to PAL on June 10, 1997.  Pl.'s Opp'n, ECF No. 57-2 ["Sununu-Frank Draft Contract"].  Under their terms, they would be paid $50,000 upon signing and a "success fee" of $600,000 if they persuaded WA to accept an ASA modification acceptable to PAL by June 30.  *Id.* ¶ 3.  Sununu's proposal did not make this success fee contingent on preserving the November 15, 1997 lease termination date.  *Id.*

While awaiting a response from PAL, Sununu tested the waters with WA.  He called WA Chairman Coleman Andrews, who agreed to meet with him if he was retained by PAL.  Def.'s Mot. Summ. J. Ex. 14, ECF No. 49-17 (Dep. of John Sununu, Feb. 3, 2010), 30:6–17 ["Sununu Dep."].  Frank obtained financial information about WA from a private firm, Tucker Anthony, Inc.  Pl.'s Opp'n Ex. A, ECF No. 57-2 ["WA Financial Info."].  This information did not include the portions of WA's publicly filed 10-K or 10-Q forms that disclosed the dispute over the lease termination date.  *Id.*  Sununu and Frank did not review any other SEC filings, Sununu Dep. 76:16–20, or request any documents from PAL.  *Id.* 65:13–20; 66:17–67:2.

On June 23, 1997, PAL gave Sununu and Frank a verbal go-ahead to undertake the project, Sununu Decl. ¶ 11, but did not sign Sununu and Frank's draft contract.  Knowing PAL's short timetable, Sununu quickly arranged a face-to-face meeting with WA Chairman Andrews in Herndon, Virginia.  Sununu Decl. ¶ 12.  Andrews informed Sununu about the airlines' "historic disagreement" over the lease termination date, Sununu Dep. 47:17, explaining that "basically the reason [WA] wasn't sitting down with Philippine airways is that Philippine airways couldn't read the contract and understand that it was a 17-month lease . . . on all the aircraft" and that if PAL didn't modify its position, WA "didn't want to negotiate with them."  *Id.* 32:19–33:4.

Andrews warned Sununu that "if that's what they're going to want to talk about"—preserving the November 15 termination date—"then you shouldn't come in."  *Id.* 47:20–21.

Shortly after receiving this information, Sununu and Frank received a formal written contract from PAL.  *Id.* 32:12–15.  It included two provisions.  First, PAL agreed to pay a $50,000 fee for Sununu's meeting with WA Chairman Andrews.  Pl.'s Opp'n Ex. E, ECF No. 57-6, ¶ 2 ["Final Contract"].  Second, PAL promised "a Success Fee of four percent [4%] of PAL savings if they are able to reach a Settlement to reduce the remaining obligation of PAL to WA in accordance with either of" two offers.  *Id.* ¶ 3.  The two offers were:

> i. WA to accept the return of four aircraft by July 1997 and PAL to pay USD$1,000 for every hour remaining of the minimum guaranteed utilization of the aircraft up to November 15, 1997; or
>
> ii. WA to reduce the lease rate on the four aircraft to USD$4,000 per hour reckoned from June 01, 1997 to November 15, 1997.

*Id.*  For Sununu and Frank to receive the success fee, "the Settlement should occur before the close of business on the 11th day of July, 1997."  *Id.* ¶ 4.

This contract differed from Sununu and Frank's earlier proposal in several ways, notably in that it made the success fee contingent on WA's willingness to recognize November 15, 1997 as the termination date for all of the leases.  Sununu and Frank were aware, based on Sununu's recent discussions with Andrews, that the November 15 date was a subject of dispute between their prospective client and WA.  Sununu Dep. 32:15–18.  Nevertheless, Sununu and Frank signed the contract.  *Id.* 90:7–13.

Now under an official retainer with PAL, Sununu continued his dialogue with Andrews.  In a meeting on June 30, 1997, Andrews again emphasized the dispute over the termination date.  He told Sununu that "World refused to negotiate the ASA with PAL if PAL insisted upon the November 15, 1997 termination date for all four aircraft."  Sununu Decl. ¶ 15.  While Sununu

had previously been aware of the dispute, it was only after this conversation—when Sununu got "fed heavy" by Andrews, to use Sununu's evocative phrase, Sununu Dep. 42:2—that he says he grasped the severity of the airlines' dispute over the termination date. Sununu Decl. ¶ 15.

Sununu and Frank took this information back to PAL executives, who assured them that the termination date of November 15 was correct. Sununu Dep. 100:11–12. Nevertheless, Sununu and Frank offered to modify their contract because they felt it was *unfair to PAL. Id.* 111:18–112:6. They reasoned that, under WA's staggered termination date theory, PAL would save substantially more money by renegotiating the ASA than they had initially estimated, thus producing an unexpectedly large success fee for Sununu and Frank. *Id.* PAL executives declined this offer, *id.* 112:13–20, and asked Sununu and Frank to "keep working." *Id.* 42:21–43:2; 111:14–15. The parties dispute whether this constituted an oral revision of the contract, as will be discussed below, but all agree that the signed written contract between PAL and Sununu-Frank was never modified in writing. *Id.* 103:10–22.

In the ensuing weeks, Sununu and Frank "made numerous phone calls to both World and PAL and had a [series] of meetings with World in Virginia." Sununu Decl. ¶ 17. Sununu devoted "almost all of [his] time" for two to three weeks "to facilitating the renegotiation of the ASA." *Id.* ¶ 20. On July 11, 1997—the deadline provided in the contract between PAL and Sununu-Frank—PAL and WA completed an amendment to the ASA. Def.'s Mot. Summ. J. Ex. 16, ECF No. 49-19. The revised agreement did not comply with either of the two contingencies spelled out in PAL's contract with Sununu and Frank, because it did not provide for the return of all the aircraft on November 15. *Id.* Also, while the revised ASA reduced rates for PAL, it did not cut them to the levels specified in PAL's contract with Sununu and Frank. *Compare id.* ¶¶

3–5 (reducing hourly rates to $5,300 at their lowest point) *with* Final Contract, ¶ 3 (requiring an hourly rate of $4,000 for Sununu and Frank to earn a success fee).

When Sununu learned that the airlines had reached an agreement—from WA, not his client—he submitted an invoice to PAL. Sununu Decl. ¶ 15; Def.'s Mot. Summ. J. Ex. 17, ECF No. 49-20, at 2 ["Invoice"]. He billed the airline for $570,000: $50,000 for his meeting with WA Chairman Andrews and $520,000 for the success fee, which he calculated as four percent of PAL's estimated $13 million savings. Invoice, at 2. Within a week, PAL paid the $50,000. Def.'s Mot. Summ. J. Ex. 15, ECF No. 49-18, at 2 ["PAL Payment"]. But the airline disputed Sununu's claim that he was entitled to a success fee.

PAL first argued that it did not owe a success fee because the ASA amendment had not saved the airline money, but rather had cost it nearly $3.3 million. Pl.'s Opp'n Ex. F, ECF No. 57-7, at 3. Frank described it as "a joke" that PAL would agree to a modification that cost it money, *id.* at 2, and Sununu replied to PAL with a letter detailing his computations. Pl.'s Opp'n Ex. G, ECF No. 57-8, at 3–5. PAL acknowledged a minor mathematical error but maintained that the revised agreement would cost it more than $2.8 million. Pl.'s Opp'n Ex. H, ECF No. 57-9, at 2–3. Later, however, PAL recognized that the amended ASA had saved it nearly $12.8 million, Pl.'s Opp'n Ex. R, ECF No. 57-20, at 8, and explained that it had denied the $520,000 to Sununu and Frank because "the amendment did not meet the criteria for [them] to earn a success fee." Def.'s Stmnt. of Mat. Facts As To Which There Is No Genuine Issue, ECF No. 49-3, ¶ 44.

### B. Procedural History

In May 1998, Sununu and Frank[2] filed suit in this Court. Compl., May 12, 1998, Docket. No. 1.[3] They alleged three counts against PAL: breach of contract, unjust enrichment, and fraud.

---

[2] Ambassador Frank died in April 2010, but he remains a named party in this case. Because the Court grants PAL's motion for summary judgment, it will not consider whether he remains a properly named party.

*Id.* at 1–9. Because PAL was embroiled in bankruptcy proceedings in the Northern District of California and before the Philippine Securities and Exchange Commission, it filed for a stay in this Court. Notice of Stay, June 29, 1998, Docket No. 3. The bankruptcy court issued an order enjoining "the commencement or continuation of any action or proceeding . . . against PAL" in the United States. *In re Ancillary Petition Regarding Philippine Airlines, Inc.*, No. 98-32705-TC, at 2 (Bankr. N.D. Cal. Jan. 20, 1999). This case went dormant for the next nine years.

In 2008, the Philippine SEC approved PAL's exit from its rehabilitation proceedings, the bankruptcy court terminated the injunction, and this case resumed. Notice of Bankr. Court's Dismissal of Proceedings and Termination of Injunction, Aug. 21, 2008, ECF No. 10-1. PAL moved to dismiss Sununu and Frank's suit for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Def's Mot. to Dismiss, Nov. 14, 2008, ECF No. 14.

The Court[4] first considered the breach of contract claim. Sununu and Frank argued that they had "substantially performed" the contract provisions necessary to collect a success fee, and that PAL's refusal to pay thus constituted breach. *Sununu v. Philippine Airlines, Inc. (Sununu I)*, 638 F. Supp. 2d 35, 39 (D.D.C. 2009). The Court explained that substantial performance was reserved for cases when "a contracting party has failed to render full performance but any defects in performance are considered minor." *Id.* at 39. In this case, the defect in performance was "not minor at all." *Id.* The contract between PAL and Sununu-Frank "clearly set out two alternative terms required to earn the four percent Success Fee." *Id.* at 40. Since Sununu and Frank did not persuade WA to accept either of the offers, the Court held that substantial performance was "inapplicable" and dismissed the breach of contract claim. *Id.* at 39.

---

[3] The complaint and several other early filings in this case were submitted before this Court converted to the Electronic Case Filing ("ECF") system. Thus, no ECF citation can be provided.
[4] The case was assigned to Judge Kennedy from its filing in 1998 until May 4, 2011, when it was transferred by consent to Chief Judge Lamberth. Reassignment of Civil Case, May 4, 2011, ECF No. 63.

The Court next considered the unjust enrichment and fraud claims. Sununu and Frank alleged that "PAL knew when it presented the fee Agreement . . . that the November 15th, 1997 termination date for the lease of the four aircraft was wrong." Compl. ¶ 18. Given that PAL benefited from their services, Sununu and Frank argued that they were entitled to fair and reasonable compensation. Compl. ¶¶ 24–26. They also argued that PAL "intentionally falsely represented" to them that all four leases would end on November 15 and "concealed from them" the staggered termination dates, making PAL liable for fraud. Compl. ¶ 28.

Taking all allegations in the complaint as true, the Court found that Sununu and Frank had "state[d] sufficient facts to support an allegation that the contract between plaintiffs and Philippine Airlines was invalid due to fraud." *Sununu I*, 638 F. Supp. 2d at 40–41. Because fraud, if established, would invalidate the contract between PAL and Sununu-Frank, the Court found that Sununu and Frank also had the potential to make out a claim for unjust enrichment. *Id.* The Court thus denied PAL's motion to dismiss on the unjust enrichment and fraud counts. *Id.* at 42. PAL then answered the complaint, participated in discovery, and moved for summary judgment. Def.'s Mot. Summ. J., ECF No. 49.

## III.    LEGAL STANDARD

According to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(c). This standard requires more than the mere existence of *some* factual dispute between the parties; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. IRS*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

In seeking summary judgment, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those potions [of the evidence in the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden has been met, the non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the evidence in the record] designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotations omitted). In doing so, the non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009); *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (holding that the plaintiff must have more than "a scintilla of evidence to support [her] claims"). In other words, the non-moving party is required to point to evidence that would permit a reasonable jury to find in her favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). At the same time, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

In this case, Sununu and Frank argue that summary judgment should be used "sparingly" when questions of the parties' intent are at issue. Pl.'s Opp'n ECF No. 57, at 17 (quoting *Graham v. Long Island R.R.*, 239 F.3d 34, 38 (2d Cir. 2000)). While they are correct that issues

of intent often raise disputes over material fact that can best be resolved at trial, no special rules apply to state-of-mind questions. When a moving party meets the requirements of Rule 56, summary judgment will be granted. *See, e.g.*, *Sage v. Broadcasting Publications, Inc.*, 997 F. Supp. 49 (D.D.C. 1998) (granting summary judgment motion on fraud claim).

After analyzing PAL's motion under the standard outlined above and in light of the parties' legal memoranda, the applicable case law, and the entire record of the case, the Court finds that no material facts remain in genuine dispute and that PAL must prevail as a matter of law. The Court will thus grant PAL's motion for summary judgment. The Court's reasoning is set forth below.

## IV. ANALYSIS

### A. Fraud

The crux of Sununu and Frank's theory is that PAL fraudulently concocted contract terms that it knew Sununu and Frank could not meet, thus sending them on the consulting equivalent of *Mission Impossible* and allowing the Manila airline "to obtain Sununu and Frank's valuable services, without having to pay [the] Success Fee." Compl. ¶ 30. Under the common law of the District of Columbia, a plaintiff alleging fraud must establish five elements: (1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) an action that is taken in reliance upon the representation. *Sununu I*, 638 F. Supp. 2d at 41 (quoting *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 78 (D.D.C. 2005)). The bar for fraud is high—it must be proved by "clear and convincing" evidence at trial. *In re Estate of McKenney*, 953 A.2d 336, 342 (D.C. 2008). At this stage, however, Sununu and Frank need only establish a material fact in genuine dispute to defeat PAL's motion for summary judgment.

###### 1.    PAL's Representation of the Termination Date to Sununu and Frank

Sununu and Frank first allege that PAL committed fraud when airline executives "intentionally falsely represented to Sununu and Frank . . . that the leases of all four aircraft would end on November 15, 1997." Compl. ¶ 28. The Court need not resolve whether this statement was actually false, however, because fraud requires that an accused party make the statement "with knowledge of its falsity." *Sununu I*, 638 F. Supp. 2d at 41.

Sununu and Frank point to no evidence that PAL knew the November 15 termination date to be false. To the contrary, the record confirms that PAL believed its position was correct. The Air Services Agreement clearly specifies the date, ASA ¶ 2.1, and none of the written amendments altered it. The letters exchanged between PAL and WA executives reiterate PAL's position that all four leases would terminate on "15-Nov-97." Bautista Letter, at 2. WA publicly disclosed PAL's insistence on the November 15 deadline when it reported the disagreement between the airlines in its SEC filings. WA's 10-K, at 8; WA's 10-Q, at 19. WA confirmed the same position privately in its conversation with Sununu. Sununu Dep. 32:19–33:4. In short, while the termination date itself was disputed heatedly, the sincerity of PAL's belief is not.

Sununu and Frank suggest that PAL's decision to solicit the opinion of outside counsel on the interpretation of the ASA indicates the insincerity of its position. Pl.'s Opp'n 27; *see id.*, Ex. N, ECF No. 57-16 ["Cohan Opinion Letter"]. But this allegation finds no support in the record. As Sununu and Frank should well understand, seeking the opinion of an outside party such as a lawyer can be a sound business decision, not a signal of self-doubt. Indeed, in this case the outside counsel suggested an even more aggressive position than PAL adopted—that the airline could terminate the two additional leases at the end of any thirty-day period. Cohan

Opinion Letter, at 2.[5]  The record here indicates that, if anything, the outside legal opinion strengthened PAL's conviction that its position about the November 15 termination date was correct.  Pl.'s Opp'n 27, Ex. O, ECF No. 57-17 (highlighting an internal memo to PAL Chairman Lucio Tan arguing that the outside counsel's argument was a "good negotiating point").

Sununu and Frank contend that PAL made another false representation by suggesting that the two success fee offers in the contract were "possible of achievement."  Compl. ¶ 29.  But there is nothing in the record to demonstrate that PAL believed an agreement based on a November 15 termination date was impossible. WA Chairman Andrews told Sununu that his company did not want to negotiate unless PAL dropped its insistence on the November 15 date, Sununu Dep. 32:13–33:4, but this merely reiterates the severity of the dispute.  It is hardly unreasonable to think that PAL would hire Sununu and Frank—offering them a potential reward of several hundred thousands dollars—to see if they could change WA's mind.

Finally, Sununu and Frank suggest that there is a genuine issue of material fact about whether PAL and WA had agreed to change the lease termination date before PAL retained Sununu and Frank.  Pl.'s Opp'n 21.  But they produce no credible evidence to support this theory.  They note that "PAL waited over *five months* to respond" (emphasis in original) to WA's letter suggesting that the airlines had agreed to staggered dates.  *Id.*  But there is no evidence that this delay represented consent by PAL, and PAL's direct denial of an unwritten understanding demonstrates the opposite.  Bautista Letter, at 2 ("In our discussion/negotiations, we emphasized that PAL has constraints in extending the lease beyond the expiry date of 15 November 1997 . . . .").

---

[5] The outside counsel also notes WA's precarious financial position and recommends that PAL negotiate a settlement.

Sununu's conversation with WA Chairman Andrews shortly before he entered the contract further confirms the lack of any contemporaneous agreement between the two airlines on the termination date. Sununu Dep. 32:19–33:4 (recounting that Andrews accused PAL of not being able to "read the contract and understand that it was a 17-month lease . . . on all the aircraft"). Sununu and Frank's allegation that there was some sort of secret amendment thus fails to rise beyond a conclusory allegation and cannot be considered a genuine issue of material fact.

### 2. *PAL's Failure to Disclose Its Dispute with WA to Sununu and Frank*

In addition to their allegation that PAL affirmatively misrepresented the lease termination date, Sununu and Frank allege that PAL "fraudulently omitted" to notify them about "the ongoing dispute between PAL and World regarding the termination date." Pl.'s Opp'n 18.

While a misrepresentation "commonly takes the form of spoken or written words," Restatement (Second) of Contracts § 159, cmt. a (1981) ["Restatement"], D.C. law provides that nondisclosure of a fact can constitute a fraudulent misrepresentation in "certain very limited circumstances." *Resolution Trust Corp. v. District of Columbia*, 78 F.3d 606, 609 (D.C. Cir. 1996). This Court has explained that, "[i]t is well established under District of Columbia law that 'mere silence does not constitute fraud unless there is a duty to speak.'" *Cadet v. Draper & Goldberg, PLLC*, No. 05-2015 (JDB), 2007 WL 2893418, at *6 (D.D.C. Sept. 28, 2007) (quoting *Kapiloff v. Abington Plaza Corp.,* 59 A.2d 516, 517 (D.C. 1948)).

A duty to speak can stem from a fiduciary relationship. *Id.* D.C. law provides that "no fiduciary relationship arises" when "contracts are negotiated and entered into at arms length." *Regency Comms., Inc. v. Cleartel Comms., Inc.*, 160 F. Supp. 2d 36, 42 (D.D.C. 2001). Such a relationship can arise, however, when "the parties extend[] their relationship beyond the limits of

the contractual obligations." *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008). Here there is no suggestion by Sununu and Frank that their arrangement with PAL was anything more than an arms length transaction or that either party extended the relationship beyond the limits of the contract. Thus, no fiduciary relationship exists.

The duty to speak also attaches in "an instance where a material fact is *unobservable or undiscoverable* by 'an ordinarily prudent person upon reasonable inspection.'" *Cadet*, 2007 WL 2893418, at *6 (quoting *Loughlin v. United States,* 230 F. Supp. 2d 26, 50 (D.D.C. 2002)) (emphasis added). Based on the evidence in the record, Sununu and Frank cannot show that the existence of the dispute between PAL and WA was "unobservable or undiscoverable." By Sununu's own admission, he spoke with WA Chairman Andrews before he signed the contract with PAL, and Andrews informed him about the dispute. Sununu Decl. ¶ 12 ("Mr. Andrews told me that the ASA had staggered termination dates and that not all aircraft leases terminated on November 15, 1997, as was communicated to me by Mr. Tan."); Sununu Dep. 32:13–33:4. Thus, not only was the information not "undiscoverable"—it was discovered by Sununu himself.

Sununu and Frank make much of the fact that the initial draft of the contract, which they wrote, did not include a November 15 termination date. Pl.'s Opp'n ¶ 20; Sununu-Frank Offer, at 2–3. This is irrelevant. PAL did not agree to that contract. But Sununu and Frank did agree to the contract PAL wrote. The fact that Sununu and Frank preferred a success fee arrangement not linked to a specific deadline may have been a reason to renegotiate the contract they signed, but it is not sufficient grounds to claim fraud now.

Sununu and Frank make a more nuanced claim that, while they may have been aware of the existence of the dispute, they did not appreciate its significance at the time they entered into the contract. Pl.'s Opp'n 22. They suggest that PAL committed fraud because it did not disclose

the *severity* of the dispute. *Id.* But the evidence on this slightly modified claim is no stronger than on the first. If the existence of the dispute was discoverable in Sununu's pre-contract conversations with Andrews, there is no reason to believe that the severity was any less discoverable, especially given Andrews's caustic remark that PAL "couldn't read the contract and understand that it was a 17-month lease," Sununu Dep. 23:21–22, and his warning that Sununu "shouldn't come in" if PAL would not abandon its insistence on the November 15 date. *Id.* 47:20–21.

Even if this exchange was not sufficient warning, however, the severity of the dispute was clearly discoverable in WA's 10-K and 10-Q filings, both of which were publicly available throughout the time Sununu and Frank were contemplating their arrangement with PAL. WA's 10-K; WA's 10-Q. Frank in fact reviewed some of WA's financial information, *see* WA Financial Info., and claimed in his letter justifying a success fee that he and Sununu "researched SEC filings, Bloomberg and other reports on WA to use in our discussions and negotiations." Frank Letter to PAL, at 3. In *Cadet*, this Court held that examining readily available public records was part of the responsibility of an "ordinarily prudent person" conducting a "reasonable inspection," and that failure to perform this basic due diligence precluded a fraud claim. *Cadet*, 2007 WL 2893418, at *7. While the facts of that case related to purchasing property, Sununu and Frank had a similar duty here. The fact that they were sophisticated businessmen undertaking a consulting arrangement focused on financial matters reinforces their responsibility to conduct basic due diligence. *Cf. Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d. Cir. 1984) (explaining the duty of sophisticated business investors to use their access to information). They cannot credibly argue that information about the dispute was undiscoverable simply because they failed to review the right financial filings.

As part of their argument that they did not understand the significance of the dispute between WA and PAL, Sununu and Frank allege a genuine dispute of material fact over the timetable on which Sununu learned about the dispute. Pl.'s Opp'n 22. They maintain that they did not appreciate the significance of Andrews's initial warning about the lease termination dispute because they had not yet received PAL's contract tying the success fee to the November 15 deadline. *Id.* If they did not make this connection, however, they have only themselves to blame. As Sununu and Frank point out in their submission to this Court, Sununu received notification about the lease dispute from Andrews "*prior to receiving the revised agreement from PAL*" *id.* at 23 (emphasis added)—and they signed it anyway. Whatever elements of the timetable remain in dispute, they cannot change the fact that the plaintiffs signed the contract knowing about the dispute and capable of discovering its significance.

### 3. *Sununu and Frank's Affirmation of the Contract*

Even if the Court were to set the disclosure issue aside, Sununu and Frank cannot prevail on their fraud claim because they affirmed their contract with PAL. "A party's power to avoid a contract due to fraud or duress is lost if, after the circumstances that made the contract voidable have ceased to exist, the party 'manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance.'" *Schmidt v. Shah*, 696 F. Supp. 2d 44, 63 (D.D.C. 2010) (quoting Restatement § 380).

The record in this case makes clear that Sununu and Frank attempted to fulfill the contract long after they learned about the severity of the dispute between PAL and WA. Their first action after Sununu was "fed heavy" by WA Chairman Andrews was to approach PAL about altering the contract to protect PAL from having to pay an unreasonably large success fee. Sununu Decl. ¶ 15. When PAL instructed them to keep working, *id.* ¶ 16—in essence declining

to amend the contract—Sununu and Frank continued trying to persuade WA to renegotiate the ASA. "Almost all of my time in this two to three week period was devoted to facilitating the renegotiation of the ASA." Sununu Decl. ¶ 19. Sununu and Frank did nothing to suggest that they had disaffirmed the contract. "[W]e never pressed that hard [for an amendment] because we thought that the original document was appropriate and sufficient." Sununu Dep. 107:17–19.

When they learned that PAL and WA had amended the ASA, Sununu and Frank invoiced PAL and accepted $50,000 in payment. Invoice, at 2; PAL Payment, at 2. Thus, well "after the circumstances that [allegedly] made the contract voidable have ceased to exist," Sununu and Frank "manifest[ed] to the other party" their intention to affirm it. As a matter of law, they cannot attempt to both collect on the contract and void it for fraud. *Schmidt*, 696 F. Supp. 2d at 63–64 ("[T]he acceptance of benefits under the contract necessarily bars denial of its validity.") (quoting *Goldstein v. S & A Restaurant Corp.*, 622 F. Supp. 2d 139, 145 (D.D.C. 1985)).

As an alternative claim, Sununu and Frank allege that PAL accepted their proposed revision of the contract and agreed to pay a success fee of four percent of any savings, regardless of whether the agreement complied with one of the two offers specified by the contract. Sununu Decl. ¶ 16. According to this theory, the modified oral agreement replaced and invalidated the original written contract. Sununu Dep. 44:18-19 ("[W]e believed there was a $50,000 retainer and 4 percent of the savings."). Problematically for the plaintiffs, they submit no evidence beyond their own conclusory allegations that PAL accepted their proposed revision. Even more problematically, these conclusory allegations are directly contradicted by Sununu's deposition. Sununu Dep. 106:22–107:5 (Q: "[Y]ou never actually ended up negotiating an amendment to the success fee terms for that cap? A: No, we – we thought it was in our client's best interest if we

spent all our time putting pressure on World Airways . . . ."); 44:7–12 ("I don't think I related that issue [of the staggered termination dates] specifically to the contract.").

Even if the Court overlooks this internal inconsistency and presumes that PAL modified the contract in the way Sununu and Frank suggest, the plaintiffs still cannot escape summary judgment. If PAL agreed to the revised contract proposal, any complaint for failure to perform the contract would sound in breach, not fraud. But Sununu and Frank's breach claim has been dismissed, and no other such claim is before this Court. Thus, even if Sununu and Frank could show a genuine dispute over whether their contract with PAL was modified, they cannot show that the dispute is material. While both parties should have been more forthright about their intentions, a reasonable jury could not find fraud.

## B.      Unjust Enrichment

In addition to their fraud claim, Sununu and Frank allege that PAL caused them "to use their prestige, reputations and personal contacts to successfully persuade World Airways to lower the lease rates when PAL well know that the settlement would be structured differently from either one of the structures described in . . . the Agreement." Compl. ¶ 22. As a result, Sununu and Frank argue, "PAL has been unjustly enriched" by reaping the savings Sununu and Frank helped sow without compensating them for their labor. *Id.* ¶ 24.

Under D.C. law, unjust enrichment has three elements: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *Sununu I*, 638 F. Supp. 2d at 40 (quoting *Rapaport v. U.S. Dep't of Treasury*, 59 F.3d. 212, 217 (D.C. Cir. 1995)). Construing the evidence in a light most favorable to the non-moving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the Court can assume that Sununu

and Frank conferred a benefit on PAL through their efforts to persuade WA to negotiate with PAL. The Court can likewise assume that Sununu and Frank satisfied the second element of unjust enrichment—that PAL accepted and retained the benefit—when the airline pocketed the full savings it achieved from the renegotiation of the ASA. This case turns on the third element of the test: whether it would be unjust for PAL not to repay Sununu and Frank for the benefit.

Unjust enrichment is an equitable claim. The Court awards relief based on quasi-contractual principles, implying by law a contract where one did not exist in fact. *See United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 247 (D.C. Cir. 1996). Thus, as this Court explained in *Sununu I*, the existence of an express contract precludes an unjust enrichment claim. *Sununu I*, 638 F. Supp. 2d at 40; *see Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997) ("There can be no claim for unjust enrichment when an express contract exists between the parties.").

Sununu and Frank do not contest this foundational principle of contract law. Instead, they contend that their agreement with PAL was invalid and thus does not bar their unjust enrichment claim. Pl.'s Opp'n 27. They stake this claim on three grounds: that the contract was rescinded, that the contract was void for unilateral mistake, and that the contract was void for material misrepresentation. The Court will examine each of these arguments in turn.

### 1.	*Rescission*

Sununu and Frank first argue that their contract with PAL was invalid because it was rescinded. *Id.* at 25. They note that, under D.C. contract law, rescission can occur "when one party offers the rescission and the other party neither accepts nor rejects the offer." *Id.* They claim that they rescinded the contract when they "offered a different deal, to which PAL never responded" after they learned about the severity of the lease termination dispute from WA. *Id.*

There are several problems with this argument.  First, Sununu and Frank present no evidence that their discussions with PAL constituted an offer to *rescind* the contract and not merely to *modify* it.  Sununu Decl. ¶ 14 ("Mr. Frank and I approached PAL about *modifying* our remuneration.") (emphasis added).  Under traditional contract law principles, an unanswered proposal to modify a contract operates as unaccepted offer—leaving the underlying contract unchanged—not as a rescission of the agreement.  *See* Restatement § 69.  For example, if an employee asks his boss for a raise and the boss doesn't answer, the employee continues to work at his existing wage.  No one would suggest that his employment contract is terminated.

The facts alleged by the plaintiffs make rescission even less plausible here.  Sununu and Frank claim they proposed amending the contract with PAL to make it more favorable to PAL by replacing the four-percent success fee with a fixed figure.  Sununu Decl. ¶ 14; Sununu Dep. 112:2–4.  To return to the example above, this is the equivalent of the employee asking his boss for a pay cut.  Even if Sununu and Frank are correct that PAL did not respond to their allegedly generous offer, it makes little sense to conclude that they would opt to rescind a contract they believed disproportionately benefited them.  Sununu Dep. 112:13–17 ("We frankly concluded that if they didn't want to jump on a fixed number, that that was okay . . . they could decide at any time in this process to cancel us, and they didn't.").  Moreover, Sununu's deposition directly contradicts the allegation that the contract was rescinded.  When asked if he had tried to rescind his contract with PAL, he answered, "No, I don't do that to clients."  *Id.* 91:20–22.

Even if the Court sets aside the argument above and assumes that Sununu and Frank did intend to rescind, D.C. contract law provides that rescission must be total, not partial.  *See, e.g.*, *Friedman v. Kennedy*, 40 A.2d 72, 75 (D.C. 1944) ("A well settled principle of the law of rescission is that one may not rescind in part and affirm in part; rescission must be in toto.").

Here, however, Sununu and Frank seek to have their contract and rescind it too. They invoiced and accepted payment of the $50,000 fee provided in the contract, yet they claim to have rescinded the other part of the contract and now seek unjust enrichment on that provision. The law will not allow them to have it both ways. *See Brown v. Hornstein*, 669 A.2d 139, 143 (D.C. 1996) (holding that a party "may not repudiate her agreement after having enjoyed its fruits").

Similarly, D.C. law provides that affirming a contract—continuing to carry it out—negates the opportunity to rescind. If a party "affirms the contract through continued performance, that party is precluded from seeking rescission." *Ellipso, Inc. v. Mann*, 480 F.3d 1153 (D.C. Cir. 2007) (quoting *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001)). As outlined in the earlier discussion of the fraud claim, Sununu and Frank affirmed the contract by seeking to perform it, invoicing on it, and collecting on it. Finally, as the fraud section also outlines, even if Sununu and Frank could show that the contract was rescinded and replaced by their modified proposal, they would have a claim for breach of the new contract, not unjust enrichment.

### 2. *Unilateral Mistake*

Sununu and Frank next argue that their contract with PAL was invalid because it was void for unilateral mistake. Pl.'s Opp'n 28. Under this theory, Sununu and Frank's lack of knowledge about the severity of the dispute was so significant that it gave them the option to void the contract. D.C. law on unilateral mistake is guided by the Restatement, *Harbor Ins. Co. v. Stokes*, 45 F. 3d 499, 501–502 (D.C. Cir. 1995), which provides that "[w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of mistake." *Flippo Constr. Co. v. Mike Parks Diving Co.*, 521 A.2d 263, 272 (D.C. 1987) (quoting Restatement § 153).

Sununu and Frank's application of the unilateral mistake doctrine presents two problems. First, they produce no evidence to suggest that they did not bear the risk of mistake. According to the Restatement, a party bears the risk of mistake when "(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Restatement § 154. Here, the contract did not explicitly allocate the risk of mistake, although the fact that the success fee was contingent on outside events should have alerted Sununu and Frank that they would be exposed to at least some risk and should examine the contract language carefully. Furthermore, the record shows that Sununu and Frank ordered basic financial information about WA, *see* WA Financial Info., but did not ask for any documents from PAL or review publicly available SEC filings that would have revealed the extent of the dispute between the airlines. Sununu Dep. 65:13–20; 66:17–67:2. Sununu and Frank thus made a conscious decision to treat their "limited knowledge with respect to the facts to which the mistake relates" as "sufficient"—meaning that they bear the risk of mistake under D.C. law. In *Harbor Insurance*, the D.C. Circuit cited an analogous scenario in which a land purchaser assumed the risk of the contract when it "voluntarily opted to rely upon brief soil reports . . . which were inconclusive and incomplete on their face." *Harbor Ins.*, 45 F.3d at 502 (citation omitted). By performing similarly minimal investigation, Sununu and Frank likewise fall short of the legal standard to claim unilateral mistake.

Second, even if the Court were to find that Sununu and Frank could claim a unilateral mistake, the contract would be "voidable"—not void. Restatement § 153. A voidable contract gives one or both parties the *option* to invalidate the contract, whereas a void contract is

automatically invalid and thus not considered a contract at all. *See* Restatement § 7 & cmt. a; *Schmidt*, 696 F. Supp. 2d at 63–64 (distinguishing void and voidable contracts). A party must actively choose—or "elect," *id.*—to invalidate a voidable contract. Because Sununu and Frank made no such choice, they run up against the same problem that blocked their rescission claim: By seeking to fulfill the contract, they foreclosed their opportunity to invalidate it.

### 3. *Material Misrepresentation*

Finally, Sununu and Frank argue that their contract with PAL was invalid because PAL committed a material misrepresentation by failing to inform them about the severity of PAL's dispute with WA. Pl.'s Opp'n 26. This allegation largely overlaps with the plaintiffs' fraud claim, which the Court addressed above. Sununu and Frank correctly point out, however, that a contract can be invalidated for material misrepresentation without fraud—in some cases, even if that misrepresentation is innocent. *Id.* at 27; *see also Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 758 (D.C. Cir. 1985).

Depending on the circumstances, a material misrepresentation can either render a contract void or voidable. Restatement §§ 163–164. A contract is void "[i]f a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract." *Id.* § 163. Sununu and Frank fail to meet this test for the same reason they could not establish fraud: They had a "reasonable opportunity to know of the character or essential terms of the proposed contract" based on Sununu's conversations with Andrews and the publicly available financial filings. In fact, they not only had a reasonable opportunity but also, as explained above, actually discovered the dispute over the lease termination date—and signed the contract anyway.

A contract is voidable for misrepresentation "if a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying."  Restatement § 164.  Sununu and Frank present no evidence that the alleged misrepresentation induced them to enter the contract—that the reason they agreed to it was that PAL represented to them that the leases terminated on November 15, 1997.  *See Cruz v. Am. Airlines*, 356 F.3d 320, 332 (D.C. Cir. 2004) (rejecting a misrepresentation claim because the plaintiffs would have signed the liability waiver despite the misrepresentation).  If this representation had truly induced Sununu and Frank to enter the contract, they would not have been willing to affirm it once that assumption was cast into doubt.  Instead, they likely entered into the contract for reasons unrelated to—and in spite of—PAL's alleged misrepresentation.  Sununu Dep. 34:16–20 ("[W]e were pretty sure we could move things forward but . . .  we were surprised in the first discussion with [WA] that they were talking about different termination dates.")

It is also questionable whether Sununu and Frank were "justified in relying" on PAL's alleged misrepresentation given that they had undertaken their own investigation and learned that the termination dates were in fact disputed.  If the victim of an alleged misrepresentation "knows that the assertion is false or should have discovered its falsity by making a cursory examination, his reliance is clearly not justified and he is not entitled to relief."  *Resolution Trust Corp.*, 78 F.3d at 609 (quoting Restatement § 172 cmt. b).  The Court need not make either an inducement or a justifiable reliance finding as a matter of law, however, because even if Sununu and Frank could establish these factors, the contract would be voidable, not void.  As explained above, because Sununu and Frank affirmed the contract when they learned of the dispute, they cannot now void it.  Thus, their material misrepresentation claim cannot succeed.

Even with the Court viewing the evidence in the most favorable light and drawing inferences in their favor, Sununu and Frank cannot show that the contract was invalidated through rescission, unilateral mistake, or material misrepresentation. The Court thus holds that the relationship between PAL and Sununu-Frank was governed by an express contract and that unjust enrichment is not applicable. PAL's motion for summary judgment is granted.

## V.  CONCLUSION

To grant PAL's summary judgment motion is not to condone its conduct. The airline can rightly be accused of stinginess for enforcing the formalistic terms of the contract in spite of the plaintiffs' earnest efforts on its behalf. PAL's shifting explanations for why it would not pay Sununu and Frank do not reflect well on the airline's approach to business dealings. But because the airline ultimately had no obligation to pay, the facts surrounding this issue are not material to resolving the case. PAL may have violated Sununu and Frank's trust, but it did not violate the law.

For their part, Sununu and Frank seem to have done their best to serve their client, but they made a reckless bet by trusting PAL. They were accustomed to handshake deals in which personal relationships count for more than legal documents, so they made little effort to put their understandings with PAL on paper. When they ran into a client who didn't play by the same rules, they paid the price. The lesson is one that should be taught in law and business schools across America: When in doubt, write it out.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on June 20, 2011.